Halcy R. **MAYNARD** and Muriel **Maynard, Plaintiffs,**

v.

**GENERAL ELECTRIC COMPANY,**
a corporation, **Defendant.**

**Civ. A. No. 2825.**

United States District Court,
S. D. West Virginia,
Huntington Division.

Oct. 20, 1972.

**950**

Menis E. Ketchum (Greene, Ketchum & Baker), Huntington, W. Va., for plaintiffs.

William C. Beatty and Richard J. Bolen (Huddleston, Bolen, Beatty, Porter & Copen), Huntington, W. Va., for defendant.

CHRISTIE, Chief Judge:

This case is presently before the court on defendant's motion for summary judgment, under Rule 56 of the Federal Rules of Civil Procedure. The motion asserts that there is no genuine issue as to any material fact and that the defendant is entitled to judgment as a matter of law. Subdivision (e) of the Rule provides that, if the adverse party wishes to assert a contra position, the burden is upon him to come forth with "specific facts showing that there is a genuine issue for trial", and the courts have held that this subdivision means just what it says. First National Bank of Arizona v. Cities Service Co., 391 U. S. 253, at p. 288, 88 S.Ct. 1575, at p. 1592, 20 L.Ed.2d 569 (1968); Foy v. Norfolk and Western Railway Company, 377 F.2d 243, at p. 246 (4 Cir. 1967). The plaintiffs here have not come forth, by affidavit or otherwise, with any "specific facts showing that there is a genuine issue for trial." Consequently, for the purposes of the motion, the court will accept as true the facts as set forth in defendant's motion and supporting affidavit and exhibits and resolve the legal question presented.

The plaintiffs instituted this action against the defendant in the United States District Court for the Southern District of New York. That court transferred the action here pursuant to 28 U.S.C.A. § 1404(a), since it was determined that it could have been instituted in the Southern District of West Virginia and that the transfer would serve the interests of justice and the convenience of the parties and witnesses.

## FACTUAL BACKGROUND

In 1967, defendant and McNally Pittsburgh Manufacturing Company entered into negotiations concerning the purchase by McNally of a "motor control center," machinery manufactured by the defendant and used in connection with the operation of a coal mine. Subsequently a sale was consummated between the parties and arrangements for shipping the motor control center from Cincinnati, Ohio, to Hamilton, Virginia, via Huntington, West Virginia, were made with the O. K. Trucking Company, at its Huntington station. Plaintiff Halcy Maynard was employed by O. K. Trucking Company, and in the course of his employment, he was required to assist in moving the motor control center by means of a forklift truck. On February 1, 1968, while the motor control center was being moved by the forklift truck, the center fell therefrom severely injuring Mr. Maynard.

The motor control center was packaged in a container or carton manufactured by the defendant and was so designed that it could be moved by means of a forklift conveyance. It is plaintiffs' contention that the carton or container was improperly designed and constructed by defendant and, as a result, Maynard was injured when the package fell from the forklift.

In their complaint, plaintiffs base defendant's liability on successive theories of (a) negligence, (b) strict liability in tort, (c) express warranty, and (d) im-

plied warranty. Due to the fact that this suit was originally instituted in the Southern District of New York, certain conflict of laws questions arise with respect to the determination of the applicable state law to be applied in this diversity action. Counsel for defendant contends, however, and counsel for the plaintiffs has conceded in his brief, that the law of the State of West Virginia governs with respect to the question of liability and the appropriate statutes of limitation to be applied to the various theories of liability asserted by the plaintiffs. See Van Dusen v. Barrack, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945, (1964); Cope v. Anderson, 331 U.S. 461, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947).

The New York action was instituted November 9, 1970, more than two years after the date on which Maynard was injured. With regard to the counts asserting liability on the basis of (a) negligence and (b) strict liability in tort, plaintiffs have conceded that they are barred by West Virginia's two-year statute of limitation applicable to actions for damages for personal injuries. West Virginia Code, Chapter 55, Article 2, Section 12. However, with respect to the counts asserting liability on the basis of (c) express warranty and (d) implied warranty, plaintiffs contend that their claims are not barred by any statute of limitation and that they are maintainable under West Virginia law. In reply, defendant asserts that, because of various principles of law, including lack of privity, disclaimers of warranty, and applicable statutes of limitation, plaintiffs cannot maintain this action on the theory of express or implied warranty, and that defendant is entitled to have its motion for summary judgment granted as to these counts also. Concluding, as we do, that the action is not maintainable on the basis of either express or implied warranty, for lack of privity of contract between the plaintiffs and the defendant, and that defendant's motion must be granted, it is unnecessary for us to decide the other issues raised by the defendant with regard to disclaimer and the applicable statute of limitation in warranty-based claims.

 It is conceded by both parties to this litigation that the question of whether or not lack of privity will defeat a breach of warranty claim under West Virginia law has not yet been decided by West Virginia's highest court. A federal district court's duty, under such circumstances, is to examine all state statutory and decisional law having a bearing on the subject and to then make an informed prediction of what the state's highest court would decide if the case were before it. James v. United States, 467 F.2d 832 (4th Cir., 1972); Panagopoulous v. Martin, 295 F.Supp. 220 (S.D.W.Va.1969). In no event may a federal judge allow himself the luxury of deciding the case in accordance with what he thinks the state law should be or how it ought to be changed. At best, such legal prophesying is not an easy task; it is certainly one not welcomed by the author of this opinion. However, a federal judge has no alternative when such matters are presented to him. Accordingly, we will now attempt to outline why we believe West Virginia's highest court would decide that lack of privity would bar a claim based on breach of warranty if and when the issue is presented to it.

## DEFENSE OF LACK OF PRIVITY OF CONTRACT

The plaintiffs have alleged that, in conjunction with its sale of the motor control center, the defendant expressly and impliedly warranted that the carton or container in which the motor control center was packaged was fit and suitable for the purpose for which it was designed and was free from any defects. In its motion for summary judgment, defendant has not denied the existence of such warranties nor the allegations that the warranties were breached and that the carton or container was in fact defectively constructed and designed. It is the contention of defendant that, even assuming such warranties and the breach thereof, the plaintiffs may not

assert liability on the basis of the breach of these warranties inasmuch as there is no "privity of contract" between plaintiffs and defendant. In asserting the "lack of privity" theory as a bar to plaintiffs' action, defendant raises a defense which, as any student of the law is aware, has been the subject of intense discussion by the authors of innumerable law review articles and legal treatises as well as in literally hundreds of cases in recent years. The theoretical and historical basis for the defense of lack of privity in warranty-based products liability cases has been thoroughly reviewed by legal scholars and will not be covered in detail in this opinion. See 8 Williston Contracts 3rd Ed., Section 998. Thus, a summary of the background and development of this aspect of the law of warranty will suffice.

## I

An express warranty in the law of sales has been defined as,

> " 'an affirmation of the quality or condition of the thing sold (not uttered as a matter of opinion or belief,) made by the seller at the time of sale, for the purpose of assuring the buyer of the truth of the facts affirmed, and inducing him to make the purchase, if so received and relied on by the purchaser, is an express warranty.' " Shippen v. Bowen, 122 U.S. 575, 7 S.Ct. 1283, 30 L.Ed. 1172 (1887), citing Osgood v. Lewis, 2 Har. & G. 495, 518.

In early common law, an action based on warranty was regarded as being grounded in deceit and, insofar as it could be classified, was considered to be in the nature of a tort action rather than an action in contract. Subsequently, relief for breach of warranty was afforded by an action in assumpsit and the melting of the deceit action into one of assumpsit, combining tort and contract features, resulted in a cause of action with attributes of both tort and contract, a cause of action which has been described by Prosser as a "freak hybrid born of the illicit intercourse of tort and contract." W. Prosser & J. Wade, Cases and Materials on Tort, 692 (5th Ed. 1971). See also Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale Law Journal, 1099 (1960).

At early common law, only express warranties, warranties based upon promises or representations of fact, existed in the law of sales. There were no implied warranties which arose from the sale of an item and, in the absence of knowledge by a seller that the products which he sold were of bad quality, the seller was not liable to the buyer for defective merchandise, Rolle, Abr 90, pl 4; Stuart v. Wilkins, 1 Doug (Eng) 18; Parkinson v. Lee, 2 East (Eng) 314. This theory of the rights and obligations of parties to a sales transaction, exemplified by the common law rule of *caveat emptor*, however, was gradually altered and the courts began to imply an obligation of warranty in sales transactions, requiring the seller to furnish goods to the buyer which at least were merchantable even though the contract between the parties contained no such agreement or representation. See Jaeger, "Warranties of Merchantability and Fitness for Use," 16 Rutgers Law Review, 493. The law of implied warranties has been codified by the Uniform Sales Act and the Uniform Commercial Code, and implied warranties of merchantability and fitness for a particular purpose are imposed, under certain conditions, in sales transactions coming within coverage of those acts.[1]

---

1. The Uniform Commercial Code provides for an implied warranty of merchantability, West Virginia Code, Chapter 46, Article 2, Section 314, in the following terms:
 "(1) Unless excluded or modified . . . a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind
 . . . .
 "(2) Goods to be merchantable must be at least such as

## II

Beginning with the case of Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960), however, the courts began to place a different interpretation upon the obligations of warranty, holding that the warranty obligation is not a contractual obligation, but rather an obligation imposed by law "as an inference from the acts of the parties or the circumstances of the transaction and it is created by operation of law and does not arise from any agreement in fact of the parties." B. F. Goodrich Company v. Hammond, 269 F.2d 501, 504 (10th Cir. 1959).

The abolition of a privity of contract requirement with reference to warranty actions is, perhaps, best illustrated by the *Henningsen* case. In that case, the purchaser bought a car from the dealer, Bloomfield Motors, Inc., as a Mother's Day gift for his wife. With less than five hundred miles registered on the speedometer, the steering mechanism failed and the automobile left the road crashing into a wall. The wife was injured and the vehicle was described as being a total wreck. Subsequent to the accident, the husband and wife brought an action against the dealer and the manufacturer, asserting breach of an implied warranty of merchantability. The husband sought to recover damages for the loss of the automobile and for expenses incurred as a result of the injuries to his wife, and the wife sought to recover for her own personal injuries. One of the many issues raised in the case involved the question of whether the wife was entitled to recover on the basis of a breach of warranty since, admittedly, between her and the dealer and the manufacturer there was no "privity of contract" in the classical sense of that phrase. The Court held that lack of privity was not a bar to the action in an opinion which has been followed and quoted extensively in many automobile and other warranty-based products liability cases since that time. In the words of the Court, in *Henningsen*, 161 A.2d at pp. 80, 81, 83 and 100,

"There is no doubt that under early common-law concepts of contractual liability only those persons who were parties to the bargain could sue for a breach of it. In more recent times a noticeable disposition has appeared in a number of jurisdictions to break through the narrow barrier of privity when dealing with sales of goods in order to give realistic recognition to a universally accepted fact. The fact is that the dealer and the ordinary buyer do not, and are not expected to, buy goods, whether they be foodstuffs or automobiles, exclusively for their own consumption or use. Makers and manufacturers know this and advertise and market their products on that assumption; witness, the 'family' car, the baby foods, etc. The limitations of privity in contracts for the sale of goods developed their place in the law when marketing conditions were simple, when maker and buyer frequently met face to face on an equal bargaining plane and when many of the products were relatively uncomplicated and conducive to inspection by a buyer competent to evaluate their quality. . . . With the advent of mass marketing, the manufacturer became remote from the purchaser, sales were accomplished through intermediaries, and the demand for the product was created by advertising media. In such an economy it became obvious that the consumer was the person being cultivated. Manifestly, the connotation of 'consumer' was broader then that of

(a) pass without objection in the trade under the contract description; and

(c) are fit for the ordinary purposes for which such goods are used; and

. . . . .

(e) are adequately contained, packaged, and labeled as the agreement may require . . . ."

'buyer.' He signified such a person who, in the reasonable contemplation of the parties to the sale, might be expected to use the product. Thus, where the commodities sold are such that if defectively manufactured they will be dangerous to life or limb, then society's interests can only be protected by eliminating the requirement of privity between the maker and his dealers and the reasonably expected ultimate consumer. In that way the burden of losses consequent upon use of defective articles is borne by those who are in a position to either control the danger or make an equitable distribution of the losses when they do occur. As Harper & James put it, 'the interest in consumer protection calls for warranties by the maker that *do* run with the goods, to reach all who are likely to be hurt by the use of the unfit commodity for a purpose ordinarily to be expected.' (pp. 80, 81).

"Under modern conditions the ordinary layman, on responding to the importuning of colorful advertising, has neither the opportunity nor the capacity to inspect or to determine the fitness of an automobile for use; . . . his remedies and those of persons who properly claim through him should not depend 'upon the intricacies of the law of sales. The obligation of the manufacturer should not be based alone on privity of contract. It should rest, as was once said, upon "the demands of social justice." ' (p. 83).

". . . [I]t is our opinion that an implied warranty of merchantability chargeable to either an automobile manufacturer or a dealer extends to the purchaser of the car, members of his family, and to other persons occupying or using it with his consent. It would be wholly opposed to reality to say that use by such person is not within the anticipation of the parties to such a warranty of reasonable suitability of an automobile for ordinary highway operation. Those persons must be considered within the distributive chain." (p. 100).

The holding in the *Henningsen* case with regard to the requirement of privity has been applied and expanded by the decisions of courts in a great many jurisdictions. See 75 A.L.R.2d 39.

## III

Having examined the theory and historical basis for warranty-based products liability, we must now turn our attention to the law of West Virginia in order to determine whether plaintiffs' cause of action for breach of warranty can be maintained under the law of that state. In the case of Pennington v. Cranberry Fuel Company, 117 W.Va. 680, 186 S.E. 610, 611 (1936), the Supreme Court of Appeals of West Virginia was required to determine whether the law implied a warranty of fitness for human consumption in the case of a sale by a retailer to a consumer of food in a sealed package when the food had been previously packaged by a manufacturer and the package was unbroken at the time of the sale. Though recognizing a conflict in the decisions of the various courts deciding the question, the West Virginia Court concluded that "the better-reasoned rule is to the effect that there is no warranty of fitness by a retailer who purchases goods of a reputable brand from a jobber or manufacturer in sealed packages or containers and sells them in the same condition that they were in when purchased and without the opportunity of inspecting or of otherwise determining the condition of the contents of the packages." In Burgess v. Sanitary Meats Market, 121 W. Va. 605, 5 S.E.2d 785, 787 (W.Va.1939), the implied warranty in issue again involved the sale of food for human consumption. In this case the court, noting that the facts were distinguishable from those involved in the *Pennington* case inasmuch as the food (minced ham) was not sold in a sealed package or container by the defendant-retailer, held that, as an exception to the rule of *caveat emptor*, "where food is purchased from a re-

tail dealer for immediate consumption, there is generally an implied warranty that the article sold is fit for human consumption." Although the facts of the *Burgess* case did not bar the plaintiff from recovery because of any lack of privity, the Court noted in its opinion that the food seller's implied warranty of fitness for human consumption did not "inure to the benefit of parties other than the purchaser." In thus limiting the extension of the implied warranty to the purchaser, the court, as in the *Pennington* case, was adopting a more conservative view with regard to the applicability and coverage of implied warranties in sales transactions. See 75 A. L.R.2d 39, Section 12.

The next two West Virginia cases involving products liability issues, Payne v. Valley Motor Sales, Incorporated, 146 W.Va. 1063, 124 S.E.2d 622 (1962), and Williams v. Chrysler Corporation, 148 W.Va. 655, 137 S.E.2d 225 (1964), although not directly involving the issue of privity of contract, are important as indications of the approach of the West Virginia Court to the problems presented by warranty-based causes of action. In the *Payne* case, the court was faced with the question of whether or not it should give effect to an express warranty in an automobile sale which specifically limited damages recoverable to replacement of defective parts and excluded all other warranties, express or implied. The court refused to follow the lead set by the New Jersey Court in the *Henningsen* case wherein that court held that the warranty was so unfair to the purchaser that, as a matter of public policy, no effect would be given to any of its provisions, including the provision excluding implied warranties and the provisions limiting damages to the replacement of defective parts. Instead, the West Virginia Court, basing its opinion on earlier precedent and upon the "recognized right of parties to contract and to have such contracts upheld by a court," held that effect should be given to the words of the express warranty which excluded implied warranties

and limited the liability of the manufacturer or seller. In refusing to accept the views with respect to warranties espoused by the court in the *Henningsen* case, the West Virginia Court, in the *Payne* case, gave some weight to the fact that West Virginia, unlike New Jersey and some other states, had not adopted a Uniform Sales Act. According to the West Virginia Court, this state has "no statutory provisions with regard to implied warranties wherein they could come within the principle that they were a 'child of the law' . . . ." The Court also noted that other jurisdictions which had refused to apply the *Henningsen* rationale had relied, in part, upon the theory that a change to the *Henningsen* rule required legislative rather than judicial action.

In the *Williams* case, the Court was required to determine whether an ultimate purchaser of an automobile, asserting a claim against the manufacturer based upon negligence, was precluded from recovering consequential damages by an express warranty excluding implied warranties and limiting liability to replacement of parts. As in the *Payne* case, the Court gave effect to the restrictive language of the warranty provisions, however, the Court, in the course of its opinion, expressed its views on a number of matters affecting liability in warranty-based products liability cases. In discussing the apparent abolition of the privity requirement, as it applied to negligence-based actions, by the New York Court in MacPherson v. Buick Motor Company, 217 N.Y. 382, 111 N.E. 1050 (1916), the West Virginia Court, in *Williams*, made the following remarks concerning the state of the law in West Virginia:

"Perhaps in order that the issues before this Court be presented in their true perspective, reference should be made to the English case of Winterbottom v. Wright, 10 M & W 109, 152 Eng. Reprint 402, decided in 1842 (hereinafter referred to as the *Wright* case). This state came into

existence twenty-one years after the decision of the *Wright* case, but Article VIII, Section 21, of our Constitution provides that the common law in existence at the time of the adoption of our Constitution shall, unless changed by the Legislature, be and remain the law of this jurisdiction. Succinctly, the *Wright* case held that if A. and B. entered into a contract, C. could not maintain an action or suit against A. whether it be ex contractu or ex delicto inasmuch as there was no privity between A. and C."

The court adverted to the fact that the West Virginia Legislature had adopted, effective July 1, 1964, the provisions of the Uniform Commercial Code. The court also noted that during the course of its decision in the *Payne* case, it had taken notice of the fact that the provisions of the Uniform Sales Act, incorporated in and made a part of the Uniform Commercial Code, were not in effect in West Virginia and for that reason "implied warranties could not be considered a child of the law" in determining warranty issues on the basis of public policy. The court intimated that its decision might have been different had the Uniform Commercial Code been in effect at the time of the occurrence giving rise to the litigation then before it.

Based upon the precedents established in its decisions, it is obvious that the West Virginia Court has adopted a conservative approach with respect to warranty-based products liability law. Of course, as pointed out by the court, its decisions will be affected by the adoption of the Uniform Commercial Code in the state, and, accordingly, it becomes necessary to examine the Code to determine the extent, if any, to which the law has been "liberalized" with reference to warranty in general and with respect to the requirement of privity of contract in particular.

The coverage of express and implied warranties, in fact, has been broadened by specific provisions of the Uniform Commercial Code. West Virginia Code, Chapter 46, Article 2, Section 318. That section of the Code provides as follows:

"A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section."

It is obvious from a reading of this section of the Code that, although the provisions of express and implied warranties have been expanded to cover persons not previously considered in privity with a seller, nevertheless, the section falls far short of abolishing the privity of contract requirement. Thus, no mention is made in the Code provisions concerning the requirement of privity between an ultimate purchaser or other person affected by the product and its manufacturer where the manufacturer has sold its products to a retailer who, in turn, has sold the product to a consumer. In this regard, it is noted in the Official Comment that, beyond the question of the extension of express and implied warranties to natural persons in the family or household of the buyer or guests, "the section is neutral and is not intended to enlarge or restrict the developing case law on whether the seller's warranties, given to his buyer who resells, extend to other persons in the distributive chain."

In the only other case in which the question of the requirement of privity of contract has arisen subsequent to the enactment of the Uniform Commercial Code by the West Virginia Legislature, Debbis v. Hertz Corporation, 269 F. Supp. 671 (D.C.M.D., 1967), a diversity action in which the district court applied West Virginia law, the court held that privity of contract was a requirement for establishing liability in warranty-based products liability cases, with the only exceptions being those set forth

in Section 318 of the Code. Having reviewed the decisions of the Supreme Court of Appeals of West Virginia, as well as the applicable statutory law, it is the opinion of this court that the Maryland District Court was undoubtedly correct in its assessment of the West Virginia law. However open to criticism the reasoning of the West Virginia Court may have been in the *Payne* and *Williams* decisions,[2] nevertheless, it appears that the court has chosen to rely upon legislative innovation rather than judicial action in abrogating the vestiges of the doctrine of privity of contract in West Virginia. The Legislature, however, has only removed that requirement in certain specific situations and has chosen not to abolish the requirement of privity entirely.[3] As shown above, the West Virginia Court has consistently applied a conservative, restrictive approach in deciding warranty-based products liability cases. In food cases, the court has limited the liability of the retailer who sells brand names in sealed packages and has extended warranty protection in the sale of unsealed packages only to the purchaser. In other areas of warranty-based products liability law, such as was involved in the *Payne* and *Williams* cases, the court has refused to follow the more liberal precedent as exemplified by the *Henningsen* decision. Thus, however persuaded this Court may be by the logic and the equity of the reasoning of the courts in the *Henningsen* line of decisions, nevertheless, as expressed by Professor Cady in his recent Law Review Article, "Law of Products Liability in West Virginia," 74 W.Va.L.Rev. 283, at p. 296, the common law of warranty in West Virginia prior to the adoption of the Uniform Commercial Code is "fairly clear" and "strongly conservative."

 The West Virginia Legislature, in adopting the Uniform Commercial Code, has not chosen to provide for the expansion of the protection of warranties to the extent contemplated by the alternate provision to Section 318 drawn by the authors of the Commercial Code. Based upon this fact, and the further fact that the West Virginia Court has not indicated any willingness in the past to expand warranty protection,[4] our decision in this case must be as we have before indicated, that if the Supreme Court of Appeals of West Virginia were called upon to decide the warranty issue here presented, that court would hold that plaintiffs, because of a lack of privity with defendant, cannot maintain their cause of action based on an alleged breach of warranty, either express or implied.

2. Dean Lorenson in his Law Review article, Products Liability and Disclaimers in West Virginia, 67 W.Va.L.Rev. 291 (1965), criticizes these two decisions and concludes with the hope that "Williams be quickly forgotten as a humorless joke, dimly considered in the shadow of portentous-but misunderstood-legislative change."

3. It is important to note that the authors of the Uniform Commercial Code provided two alternatives to Section 318, both of which would have extended warranty protection to any natural person who might reasonably be expected to use, consume or be affected by the goods and who was injured in person by breach of the warranty. Adoption of either of the two alternate provisions would have clearly abolished the privity requirement not only with respect to a buyer-seller relationship but also with respect to a manufacturer and ultimate consumer or user situation. The West Virginia Legislature, however, chose to adopt the "neutral" provision, which, as shown, only extends the protection of express and implied warranties from the seller to his buyer and to a limited group of persons having a specified relationship with the buyer.

4. In a Case Comment in 65 W.Va.L.Rev. 326, at p. 329 (1963), the writer states that "as the West Virginia Court prior to the passage of the Uniform Commercial Code has indicated that warranty was based upon privity, it seems doubtful that they will expand upon the action of the legislature and further extend the protection of the Commercial Code."